Merchants Warehouse Company, Inc. v. Commissioner.
Merchants Warehouse Co. v. Commissioner
Docket No. 42297.
United States Tax Court
T.C. Memo 1956-221; 1956 Tax Ct. Memo LEXIS 67; 15 T.C.M. (CCH) 1162; T.C.M. (RIA) 56221; September 28, 1956
*67 Petitioner was organized in March 1937 to acquire and operate certain warehouse property which had been purchased at foreclosure for $350,000 by a bondholders committee of petitioner's predecessor. Petitioner transferred 535 shares of no par value common stock and $535,000 in bonds to the bondholders committee in exchange for the property. 1. Held, petitioner's unadjusted basis for the property is that of its transferor, namely, the fair market value at the time of acquisition. On the facts herein, such value is determined to be $450,000, of which $300,000 is allocable to the building and $150,000 to the land. 2. Held, further, in computing invested capital for excess profits tax purposes, the unadjusted basis of the property is to be allocated between the bonds and stock for which it was exchanged according to the fair market values of each. On the facts herein, it is held that in March 1937, the fair market value of the bonds was $375,000, and the stock, $75,000, and such amounts are to be included in borrowed capital and equity invested capital, respectively. William Waller, Esq., American Trust Building, Nashville, Tenn., and Lawrence Dortch, Esq., for the petitioner. J. Frost *68 Walker, Esq., and W. Preston White, Jr., Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion This proceeding involves deficiencies in income taxes, declared value excess profits taxes, and excess profits taxes determined against Merchants Warehouse Company, Inc., (hereinafter referred to as petitioner), as follows: Year
Tax
Deficiency
1943
Income
$ 3,091.98
D.V.E.P.T.
674.57
Excess Profits
2,700.98
1944
D.V.E.P.T.
3,059.81
Excess Profits
35,769.50
The issues to be decided are: (1) Whether respondent properly determined that the basis of petitioner's warehouse property when acquired in March 1937 was $350,000, and that, of this amount, the sum of $250,000 is allocable to the building for depreciation purposes; and (2) whether petitioner is entitled to borrowed invested capital or equity invested capital for excess profits tax purposes for its taxable years ended December 31, 1943 and December 31, 1944, in excess of the amounts allowed by the respondent in his statutory notice of deficiency. Respondent has conceded certain other issues raised by petitioner in its pleadings. Such concession will be taken into account under a Rule 50 computation. Some of the facts were stipulated. *69 Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. Petitioner is a Tennessee corporation with its principal office in Nashville, Tennessee. It filed its corporation income, declared value excess profits, and excess profits tax returns for the taxable years ended December 31, 1943, and December 31, 1944, with the former collector of internal revenue for the district of Tennessee. Petitioner was formed on March 4, 1937, for the purpose of acquiring and operating certain warehouse property known as Cummins Station in Nashville, Tennessee. The property consisted of a five-story warehouse on a tract of land in the central part of Nashville. It was rented principally to wholesalers of groceries and hardware and, in addition, part of the building was devoted to office space. Prior to petitioner's incorporation, a corporation known as Wholesale Merchants Warehouse Company (hereinafter referred to as the Warehouse Company) was the owner of this property. It had bonds outstanding in the aggregate principal amount of $550,000, secured by a deed of trust on the property. The Warehouse Company defaulted on the interest due on the bonds on July 1, *70 1934, and, on September 1, 1934, the trustee named in the deed of trust took possession of the property and proceeded to operate it for the benefit of the bondholders. Subsequently, in a proceeding in the Chancery Court of Davidson County, Tennessee, the court directed and empowered the trustee to foreclose, advertise, and sell the property. The court appointed J. M. Whitsitt (hereinafter referred to as Whitsitt) to appraise the property so as to enable it to determine the amount at which the foreclosure sale would be confirmed. On January 27, 1937, Whitsitt reported to the court that, in his opinion, the property had a value of $375,000. A bondholders committee was formed which, at the time of the foreclosure sale on February 8, 1937, held $535,000 of the total issue of $550,000 of Warehouse Company bonds. The defaulted interest coupons attached to said bonds, representing interest from January 1, 1934, to July 1, 1936, aggregated $80,250, and additional interest on the bonds for the six months ending December 31, 1936, amounted to $16,050. Under the terms of the sale, the bondholders were entitled to tender bonds and coupons in part payment of the purchase price to the same extent *71 that such bonds and coupons would be entitled to the net proceeds resulting from the sale. Since the bondholders committee held all but $15,000 par value of the outstanding bonds, any increase in the bid made by the committee at the sale, up to the amount of the bonds and coupons held by it, could be made at a net cash cost to the depositing bondholders of only 15/550 of the amount of the increase. When the property was offered for sale, the bondholders committee purchased it for the sum of $350,000 and the assumption of 1937 taxes. The bondholders committee then caused petitioner to be organized to take over the property. It directed the trustee to deed the property to petitioner and, in exchange therefor, petitioner issued to the bondholders committee for distribution to the depositing bondholders $535,000 of new 15-year, 5 per cent First Mortgage Income Bonds and, also, 535 shares of no par value common stock, constituting its entire capital stock. The trustee had accumulated a sum of cash from the operation of the building and part of such sum was used to pay the amounts due to the nondepositing bondholders. The balance of the cash held by the trustee was distributed to petitioner *72 as the new owner of the property. At a meeting of petitioner's incorporators on March 16, 1937, it was resolved that $5,350 of this amount be retained by petitioner and credited to capital, giving the 535 shares of capital stock which were to be issued a paid-in value of $10 each. The balance of the cash distributed to petitioner by the trustee was to be distributed pro rata among petitioner's stockholders. The depositing bondholders received for each bond deposited the following: (1) cash in the amount of $22.70; (2) a share of no par value common stock; and (3) a $1,000 first mortgage 5 per cent sinking fund income bond of petitioner due January 1, 1952. The nondepositing bondholders of the Warehouse Company were paid off at the rate of $686.97 for each of their $1,000 bonds. The minutes of the meeting held by petitioner's incorporators on March 16, 1937, contain the following statements: "The Chairman thereupon stated that the property of the corporation, being the real estate hereinabove referred to, and known as Cummins Station, was bid in at Court sale for the sum of $350,000.00, and that in his opinion the said sum did not represent the fair or true value of said property, and *73 that same was the result of a forced sale through Court, at which time the grantor was unwilling to sell, and no buyers were present willing to buy, other than depositing bondholders acting through their committee, and that in his opinion the value of the property greatly exceeded the purchase price at which it was being received. "The directors thereupon discussed the value of said premises fully, all of the directors having viewed the property and being familiar with it, and being generally familiar with values in the City of Nashville and vicinity, and in such conference there was taken into account that in 1926, at the time the bonds were issued by the Wholesale Merchants Warehouse Company, the said property was appraised at approximately one million four hundred thousand dollars, and that same was again appraised during the year 1931 at more than one million three hundred thousand dollars, and it was the consensus of opinion of the directors present that said property had a fair cash or market value of at least $600,000. "Thereupon, on motion, duly seconded, it was unanimously "RESOLVED, that the property acquired by this corporation, known as Cummins Station, in Nashville, Davidson *74 County, Tennessee, be, and the same is hereby declared to have a fair market value of $600,000, and that said amount be set up on the books of this corporation as the fair value of said property." The Cummins Station property was almost ideally located from a distributing standpoint for interstate, suburban, and local commerce. It was excellently situated with respect to principal highways and railroads. Two private switch tracks adjacent to it eliminated drayage on "in" and "out" shipments by railroads. In 1937, there was a gradual movement of wholesale and light manufacturing concerns towards the area in which it was located. The warehouse building had been erected in 1906 and was constructed of reinforced concrete with brick outside walls. By 1937, it had been badly used and was in need of repairs. It needed paint and new window sills, inside and out. The inside walls, heating plant, floors, and some of the elevators were in bad condition. The gross receipts of the Warehouse Company for the years 1926 to 1935, inclusive, were as follows: Year
Gross Rental
1926
$88,323.04
1927
93,328.34
1928
94,791.30
1929
71,571.52
1930
84,455.07
1931
81,540.74
1932
73,090.58
1933
51,662.22
1934
46,468.60
1935
55,182.85
There *75 were 14 units of various sizes in the building, each being separated from the others by concrete block partitions. At the time of its sale in 1937, none of the tenants in the warehouse had leases running over one year and the space in the building was rented on a floor basis instead of a unit basis. Approximately 81 per cent of the 379,500 square feet of floor space in the building was rented in January 1937. Floor space was being rented in the building at that time at an annual rate of approximately 15.7 cents per square foot. Had the building been fully rented throughout 1937, its annual gross rental would have been $62,268. In 1937, the property was assessed for state and county tax purposes at $500,000, and, for city taxes, at a value of $375,000. Insurance in the amount of $650,000 was carried on the building during that year against fire and tornado losses. Whitsitt, the court-appointed expert who prepared an appraisal of the property in 1937 in connection with its foreclosure, had been president of the Nashville Title Company until 1927. He resigned in that year to form his own mortgage and real estate business. In the course of such business, he was primarily concerned with *76 residential construction, and rarely negotiated the sale of commercial property between 1927 and 1937. In determining the value of the property, he considered such factors as its prime location, past earnings, current rentals, and its reproduction cost. Included in the report which he submitted to the court was the following estimate of the reproduction cost of the building: 400,000 square feet at $1.50 per sq. ft.
$600,000
Depreciation and Obsolescence, 50%
300,000
Depreciated Value of Building
$300,000
Land Value: 889feet at $150.00 per front
foot
133,350
Total by Reproduction Cost
$433,350
The following is an income summary of the operation of the warehouse for the year 1935: Annual Gross Receipts: (Rent, Elec-
tricity and Water)
$55,182.85
Disbursements: Insurance
$ 1,399.31
A.D.T. Service
1,167.00
Taxes
12,150.00
Payroll: (Superintendent,
2 mechanics, 1 fire-
man, 1 night watch-
man, 1 night fireman
in winter)
6,909.50
Water
621.70
City Sprinkler - head
tax
203.96
Electricity
6,579.26
Fuel
1,718.78
Supplies, repairs, main-
tenance
1,984.23
Agents commission
2,600.00
Total disbursements
35,333.74
$19,849.11
Economic conditions and the state of the real estate market had improved markedly in 1937. In that year, new warehouse *77 buildings were constructed and rented in Nashville to the Railway Express Company and to the General Electric Company at annual rentals of 28 cents and 27 cents per square foot of floor space, respectively. The ownership of most of petitioner's bonds and stock remained in the old bondholders until September 1943. The rents were not raised during this period and the interest on the income bonds was not paid in full. In September 1943, G. L. Comer, president of Washington Manufacturing Company, a clothing manufacturing concern which was one of the tenants in the building, sought to acquire the property. He was advised by his banker that the most advantageous method of acquisition would be to purchase the outstanding income bonds, with stock attached. Comer paid a Nashville brokerage concern a $6,000 commission to acquire the income bonds with stock attached at a price of $650 for each unit consisting of one $1,000 bond and one share of stock. He acquired $519,000 par value of said income bonds and 519 shares of stock for a total price of $343,350. The largest holder was Vanderbilt University which held 121 income bonds and 121 shares of stock. Altogether there were approximately 75 holders, *78 most of whom originally purchased the mortgage bonds of the Warehouse Company as fixed income investments. Comer was of the opinion that the property was in a 100 per cent location for that type of property, and that this was a bargain purchase. The rents were promptly raised after Comer acquired control, and interest was thereafter paid in full on the income bonds. The gross rentals of petitioner for the years 1937 to 1951, inclusive, the rental per square foot at which leases were negotiated during those years, and the interest paid on the bonds of petitioner during those years, were as follows: Percentage
Annual
interest
rental per
paid on
Year
Gross rents
square foot
bonds
1937 *
$ 44,247.59
15.7(
5%
1938
53,193.19
15.7(
3%
1939
54,008.32
15.7(
3%
1940
48,130.73
15.7(
2%
1941
46,976.84
15.7(
1-1/2%
1942
58,407.50
15.7(
3%
1943
71,505.94
15.7(
3%
1944
94,290.60
24(
5%
1945
86,299.92
24(
5%
1946
112,476.19
30(
5%
1947
143,042.40
42(
5%
1948
160,748.00
48(
5%
1949
164,982.20
48(
5%
1950
169,025.20
48(
5%
1951
155,706.89
54(
5%
On its income tax and declared value excess profits tax returns for the years 1943 and 1944, petitioner claimed the amounts of $508,693.97 and $508,995.97, respectively, as the basis for depreciation of its building, *79 and it claimed allowable depreciation in the respective amounts of $15,260.82 and $15,269.88. In his statutory notice of deficiency herein, respondent determined that petitioner's total cost for the land and building when acquired in 1937 was $350,000; that this amount should be allocated on the basis of $100,000 to the land and $250,000 to the building; and that, for the years 1943 and 1944, the amounts of $6,307.81 and $6,459.90, respectively, represented a reasonable allowance for depreciation on the building and subsequent additions. The indenture, dated March 15, 1937, pertaining to petitioner's first mortgage 5 per cent sinking fund income bonds reads, in part, as follows: "Section 3. The Company will not declare or pay any dividends, either in cash, stock or property, upon its common stock or any other class of stock hereafter issued unless and until out of earnings arising from the conduct of its business subsequent to March 15, 1937, it has declared and paid, out of earnings for the calendar year out of which such dividends are to be paid, at least five (5) percent as interest on its Bonds and has set aside at least five (5) percent in the sinking fund account for the retirement *80 of Bonds in the manner and to the extent hereinafter provided, and has further set aside such sum as the Board of Directors may deem reasonable and prudent for its ordinary corporate purposes, including repairs, improvements and betterments on its real estate." The declared value of petitioner's capital stock as stated on its capital-stock return for the year ended June 30, 1937, was $75,000. In computing its invested capital on its excess profits tax returns for the calendar years 1943 and 1944, petitioner listed the amount of $5,350 as "Money paid in for stock, or as paid-in surplus, or as a contribution to capital." By amended petition, petitioner alleges that respondent erred in failing to include as equity invested capital, for the years 1943 and 1944, the fair market value of the common stock which it exchanged, together with its bonds, for the warehouse property in March 1937. Petitioner alleges that such stock had a fair market value of $200,000 in March 1937. In computing its invested capital on its excess profits tax returns for the calendar years 1943 and 1944, petitioner included, as borrowed capital, the $535,000 in bonds which it had issued in 1937. Respondent determined *81 that, in computing borrowed capital for such years, petitioner was not entitled to include such $535,000 in bonds at their face value. He determined that the fair market value of the property which the bonds had been exchanged for in 1937 was $350,000, the price at which it had previously been sold at foreclosure, and that only such $350,000 could be included in borrowed capital. In March 1937, the fair market value of the Cummins Station property was $450,000, of which $150,000 is allocable to the land and $300,000 to the building located thereon. In March 1937, the fair market value of petitioner's bonds and stock was $375,000 and $75,000, respectively. Opinion FISHER, Judge: The first issue to be decided involves petitioner's depreciation deductions on its warehouse building for the calendar years 1943 and 1944. The parties have stipulated the rate of depreciation, and the sole point in dispute is the proper basis to be used. Petitioner acquired the building and the land on which it is situated in March 1937. The property had just been sold at a foreclosure sale for $350,000 to a bondholders committee which held $535,000 of the $550,000 in defaulted bonds issued by the prior owner. *82 The bondholders committee transferred it to petitioner in exchange for $535,000 of petitioner's bonds, plus 535 shares of its common stock. The parties agree that the exchange of the land and building for petitioner's bonds and stock is governed by section 112(b)(5) of the 1939 Code, and, therefore, pursuant to section 113(a)(8), petitioner's basis for the property is the same as its transferor's. The parties both proceed upon the theory that since the bondholders purchased the property at a foreclosure sale, their basis for the property and, therefore, the basis to the petitioner, is the fair market value of the property at that time. See Regulations 111, section 29.23(k)-3. ; (C.A. 8, 1941). Since petitioner desires to use as its basis an amount other than the $350,000 at which it was sold at the foreclosure sale, it must show that the fair market value of the property at that time was not, in fact, $350,000. Respondent has determined that the total basis of the land and building is the foreclosure price, $350,000, and he has allocated $250,000 of this amount to the *83 building. Petitioner contends that the fair market value of the property in March 1937 was $600,000, and that $500,000 of this amount is allocable to the building. Clearly, the price at which this property was sold at foreclosure is not an accurate measure of its fair market value for even respondent's expert, Whitsitt, had estimated its value to be in excess of the foreclosure price. As in , at page 82. "In view of the fact that the terms of the sale * * * permitted the bondholders to use the bonds in payment of the purchase price, it was of small moment to them at what precise figure they bid for the property. The only difference which the amount of their bid would make would be to control the amount of cash to be paid to the nondepositing bondholders. * * *" In the instant case, the bondholders committee could have bid in the property at any amount up to $631,300 by merely submitting the bonds and interest coupons which it held and by paying 15/535 of such amount to the nondepositing bondholders. Two estimates of the value of the property were made early in 1937, one, shortly before the foreclosure sale, by Whitsitt, in order *84 to enable the court to determine the lowest price at which the property should be sold, and the second, by petitioner's board of directors a month after the sale. Whitsitt, the court-appointed expert, appraised the property at $375,000 after a detailed analysis of many factors, including its location, rentals being charged, earnings record, and reproduction cost. After the sale of the property at foreclosure for $350,000, petitioner's board of directors passed a resolution that, in their opinion, its fair market value was $600,000 and that it should be set up on the books of the corporation at this amount. However, the factors taken into account by the members of petitioner's board of directors in arriving at this amount and their competence as appraisers has not been shown. In fact, the record demonstrates that the property did not have a fair market value of $600,000 in March 1937. Petitioner relies principally upon the testimony of two of its experts who testified that the reproduction cost of the building in March 1937, taking into account its depreciated condition, was approximately $800,000. Each of petitioner's experts accepted the various facts set forth in the Whitsitt report *85 as true, with the exception of Whitsitt's estimate of $300,000 as the reproduction cost of the building. While reproduction cost is undoubtedly an important factor to be considered in appraising a building, its record of past earnings and prospects for future earnings are equally important. Petitioner's expert admitted that in 1937, buildings were being bought by builders to return a net profit of 8 per cent, whereas in 1935, [1] the earnings of the instant property were but $19,849.11, which would be a return of approximately 3.3 per cent on an investment of $600,000. Petitioner attempts to explain the low rate of earnings by arguing that the property was being managed very poorly and that its past earnings record is not of great significance. It points to the testimony of its experts that economic conditions and conditions in the real estate market in Nashville in 1937 were far better than those existing during prior years and that, had an aggressive purchaser acquired the property at that time, he could easily have substantially increased the rentals being charged. These experts testified that similar properties in the Nashville area were being rented at 27 and 28 cents per square *86 foot, while the instant property was renting at approximately 15 cents. But we are not convinced that the properties referred to by petitioner's experts were, in fact, similar to petitioner's, particularly since petitioner's building had been erected in 1906 and was in poor condition in 1937. Furthermore, the record discloses that petitioner's property continued to be rented at an annual rental per square foot of 15.7 cents throughout the years 1937 through 1943. It was not until wartime and the postwar years that petitioner's rentals were raised to 24 cents, then 30 cents, and, finally, in 1951, to 54 cents per square foot. We therefore cannot consider the possibility that a purchaser would have increased rentals in 1937 as an established fact, particularly in view of the fact that the building was only 81 per cent rented in that year, even though the rentals being charged were allegedly so substantially under those being charged elsewhere in Nashville for similar property. We believe that though reproduction costs of the building may have been underestimated in the Whitsitt appraisal, petitioner's experts have failed to give sufficient consideration to the earnings record of the *87 property. A prospective purchaser, although undoubtedly interested in reproduction costs, would be equally interested in earnings, particularly in the case of a building as large as this which would probably be used for rental purposes rather than occupancy by a single tenant. After having given careful consideration to all the evidence and all the factors taken into account by the various experts in arriving at their valuations, we have found as a fact that the fair market value of this property was $450,000 in March 1937, and, of this amount, $300,000 is allocable to the building and $150,000 to the land. The second issue herein involves petitioner's excess profits taxes for the taxable years 1943 and 1944, and, more specifically, the computation of its "invested capital" credits for such years. Invested capital, as that term was used in the World War II Excess Profits Tax Law, included "equity invested capital," as defined in section 718 of the 1939 Code, [2] and "borrowed invested capital," as defined *88 in section 719. [3] The computation of both of these items is in dispute. When petitioner was organized by the *89 bondholders committee of its predecessor corporation, it transferred to such committee for distribution to the various bondholders, 535 shares of its common stock, plus $535,000 of its bonds, in exchange for the warehouse property. In addition to the property, it also received from the committee the sum of $5,350, part of the amount which had been accumulated by the trustee while operating the property. In computing its equity invested capital on its excess profits tax returns for 1943 and 1944, petitioner reported the amount of $5,350 as "money paid in for stock, or as paid in surplus, or as a contribution to capital"; in computing its borrowed capital, it included the $535,000 in bonds which it had issued in 1937. In his deficiency notice, respondent made no adjustment in petitioner's computation of equity invested capital. He determined, however, that the fair market value of the warehouse property, in exchange for which petitioner had issued its bonds and stock, was $350,000, and that, accordingly, only the amount of $350,000 could be regarded as borrowed capital. [4] Petitioner's answer to this is that the market value of the property exceeded the face value of the bonds, and that *90 respondent erred in decreasing the amount claimed by it as borrowed capital. In addition, by amended petition, petitioner claims that the fair market value of the stock which it issued in March 1937 should be regarded as equity invested capital, alleging that such stock had a value of at least $200,000. Section 718(a)(2) requires that property paid in for stock be included in equity invested capital at its unadjusted basis to the taxpayer. Pursuant to our determination of the first issue herein, petitioner's unadjusted basis for its warehouse property is $450,000. Since both bonds and stock were issued in exchange for this property, its $450,000 value must be allocated between the bonds and stock according to the respective values of each at the time of the exchange in order to determine the amounts includible in equity invested capital and in borrowed capital. Tennessee, , affd. (C.A. 6, 1951); cf. , affd. (C.A. 1, 1947). *91 Although the face value of the bonds alone was in excess of $450,000, it is obvious that petitioner is not entitled to claim more than this aggregate amount for the stock and bonds in computing its equity invested capital and borrowed capital. See Southern Fertilizer & Chemical Co. v. Edwards, Admr., - Fed. Supp. - (M.D. Ga., 1955). The purpose of the invested capital credit is to establish a measure by which the amount of "excess profits" can be determined, and "before capital can be considered in computing the excess profits credit, it is required that the capital actually be invested as part of the working capital; that the capital be utilized for the earning of profits; and that the capital be subject to the risk of the business. , affirming . In short, the capital must actually be 'invested' in the business." , affd. (C.A. 5, 1953), certiorari denied . Clearly, the equity and borrowed capital invested in petitioner's business in March 1937, as the result of its exchange of its bonds and stock for the warehouse *92 property, cannot be regarded as being more than the $450,000 fair market value of the property. Respondent argues that the 535 shares of stock which were issued by petitioner in conjunction with its bonds in March 1937 were paid for by the stockholders at the rate of $10 per share, and that, accordingly, petitioner's equity invested capital is to be limited to $5,350. However, the record clearly establishes that the bondholders committee caused the warehouse property to be transferred to petitioner in exchange for both its bonds and stock, and that the sum of $5,350 constituted an additional contribution to capital by the depositing bondholders. Although an entry was made on petitioner's books giving each of its shares of stock a paid-in value of $10 each, it is apparent that the stock was not issued for $10 per share but, rather, was issued in conjunction with the bonds for the warehouse property. Petitioner introduced the testimony of an expert witness, a stockbroker, who estimated that, assuming the bonds and stock had a total value of $600,000 in March 1937, the stock alone would have had a value of not less than $200,000. We think his valuation of the stock is highly excessive. *93 It is apparent, moreover, that if the over-all value of both the bonds and stock was $450,000 (which we have found as an ultimate fact) instead of the figure of $600,000 used by the witness, then, in view of the total face amount of the bonds and the overriding nature of the obligations thereunder, the ratio of the value of the stock to the bonds would be considerably less than that used by the witness. We do not have the benefit of the expert's opinion for the appropriate allocation of value as between bonds and stock on an over-all valuation of $450,000. Upon our own careful study of all of the relevant information in the record, however, we conclude that petitioner's bonds had a fair market value of $375,000 and its stock $75,000 in March 1937, and these amounts are to be used for the purpose of computing petitioner's invested capital credits. Decision will be entered under Rule 50. Footnotes
*. 11 months↩
1. The earnings record for 1936 does not appear to have been available at the time Whitsitt prepared his report in January 1937, and it has not been introduced into the record herein.↩
2. SEC. 718. EQUITY INVESTED CAPITAL. (a) Definition. - The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b) - (1) Money paid in. - Money previously paid in for stock, or as paid-in surplus, or as a contribution to capital; (2) Property paid in. - Property (other than money) previously paid in (regardless of the time paid in) for stock, or as paid-in surplus, or as a contribution to capital. Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange. * * * ↩
3. SEC. 719. BORROWED INVESTED CAPITAL. (a) Borrowed Capital. - The borrowed capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following: (1) The amount of the outstanding indebtedness (not including interest) of the taxpayer which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust, plus, * * *↩
4. Other uncontested adjustments were also made with respect to petitioner's computation of borrowed capital for 1944.↩